**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

**Daniel McCarville, individually**
**and as a representative of a class of participants**
**and beneficiaries on behalf of the Crane Savings**
**and Investment Plan,**

                                          **Civil Action No. 3:25-cv-00987-SFR**

                      **Plaintiff,**                            **CLASS ACTION**
                                                    **JURY DEMAND**

**v.**

**Crane Company and**
**Crane Savings Plan Committee,**

        **Defendants.**

**PLAINTIFF'S FIRST AMENDED CLASS ACTION COMPLAINT[1]**

1.      Plaintiff, Daniel McCarville, individually and as representatives of a class of participants and beneficiaries of the Crane Savings and Investment Plan (the "Plan") brings this Employee Retirement Income Security Act of 1974 ("ERISA")[2] action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) and Rule 23 of the Federal Rules of Civil Procedure against Defendants, Crane Company ("Crane") and Crane Savings Plan Committee ("Committee") for (1)

---

[1] Plaintiff files this First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B) and this Court's July 22, 2025 Order (ECF No. 19) providing that "Plaintiff shall respond either by filing an opposition brief or amending the complaint as of right to remedy any defects identified in Defendants' motion to dismiss or before October 17, 2025."

[2] 29 U.S.C. §§1001–1461.

failure to comply with the terms of the Plan document; (2) breach of ERISA's fiduciary duties; and (3) violation of ERISA's prohibited transaction rules.

2.      ERISA requires a fiduciary to act "solely in the interest of participants . . . for the exclusive purpose of providing benefits to participants and beneficiaries; and defraying reasonable expenses of administering the plan" to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and to refrain from "deal[ing] with the assets of the plan" in the fiduciary's own interest. 29 U.S.C. §§ 1104(a)(1)(A)-(B); 1106(b)(1). These duties of loyalty and prudence are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). These duties require fiduciaries to have "an eye single to the interests of the participants and beneficiaries," *Donovan*, 680 F.2d at 271, and "to deal fairly and honestly with beneficiaries," *Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) ("*Cunningham*").

3.      ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan.'" *Cunningham*, 604 U.S. at 697.

4.      ERISA also mandates that fiduciaries must discharge their fiduciary duties "in accordance with the documents and instruments governing the plan." 29 U.S.C. 1104(a)(1)(D). The Supreme Court has clearly stated that there is "no exemption from this duty. . ." *Kennedy v. Plan Administrator for DuPont Sav. and Inv. Plan*, 555 U.S. 285, 300, 129 S. Ct. 865 (2009).

5.      As detailed below, instead of loyally and prudently acting in the best interest of Plan participants and avoiding prohibited transactions, Defendants chose to use Plan assets exclusively to benefit Crane, to the detriment of the Plan and its participants, by using over $11 million of Plan assets to offset Crane's contractual obligations to make matching contributions to

the Plan, while using $0 to offset Plan expenses borne by participants and requiring Plan participants to pay over $5 million in Plan expenses to the Plan's third-party service providers that should never have come out of their accounts. Even more egregious, during the class period Defendants had millions of dollars of leftover forfeitures available at the end of each year that could have covered substantial portions or all of the Plan participants' expenses even after they enriched Crane with over $11 million in Plan assets.

6.    To remedy these fiduciary breaches and ERISA violations, Plaintiff, individually and as representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a), to make good to the Plan all losses resulting from each breach of fiduciary duty, and to restore to the Plans any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION, VENUE, AND ERISA EXHAUSTION

7.    This Court has exclusive subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq*.

8.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.    Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

10. Plaintiff is not required to exhaust administrative remedies under the Plan or ERISA before filing this lawsuit.

11. The claims brought by the Plaintiff arise from ERISA statutory fiduciary breaches and prohibited transactions under ERISA as to the Plan in its entirety and do not involve mismanagement of individual accounts.

12. The claims asserted on behalf of the Plan in this case fall outside the scope of any exhaustion language in the individual participants' Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose benefit claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for ERISA statutory fiduciary breaches and prohibited transactions under ERISA.

13. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies– does not, by itself, bind the Plan.

14. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances– that the Court should review and where appropriate defer to a Plan administrator's decision– does not exist here because courts will not defer to a Plan administrator's legal analysis and interpretation.

## **DEMAND FOR JURY TRIAL**

15. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all the issues so triable. *Vellali v. Yale Univ.*, 662 F. Supp. 3d 238, 242 (D.

Conn. 2023) (plaintiffs bringing ERISA breach of fiduciary duty and prohibited transaction class claims "have the right to a jury trial [] on their claims for money damages").

## **PARTIES**

16.     The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34) that covers eligible employees of Crane and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

17.     Plaintiff Daniel McCarville is a citizen of the State of Kansas, was previously employed by Crane from 2018 through 2024, and was a participant in the Plan during the class period. As such, he is a participant under ERISA § 3(7), 29 U.S.C. § 1002(7).

18.     During the class period, Plaintiff's individual account was charged, and Plaintiff paid for a share of the Plan's administrative expenses to the Plan's third-party service providers.

19.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered actual injuries through the misallocation of Plan assets by Defendants with regard to the Plan as it relates to his individual 401(k) account. This injury is fairly traceable to Defendants' unlawful conduct in using Plan assets for their own benefit and this harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiff and to the class.

20.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

21.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the misallocation of Plan assets in the form of forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

22.    Having never managed a very large 401(k) Plan, Plaintiff, and all participants in the Plan, lacked actual knowledge of how Plan forfeitures should be allocated by the Defendants and also lacked actual knowledge of how Plan forfeitures were used by the Defendants.

23.    Crane is a Delaware-incorporated company with its principal place of business at 100 First Stamford Place, Stamford, CT 06902-6740.

24.    Crane is the Plan sponsor under 29 U.S.C. § 1002(16)(B).

25.    Crane established the Committee and appointed it as the Plan Administrator pursuant to 29 U.S.C. § 1002(16)(A) with broad authority over the administration and management of the Plan.

26.    Crane and the Committee are both named fiduciaries of the Plan and each exercised discretionary authority and discretionary control over the management and administration of the Plan with respect to the matters alleged herein and were fiduciaries of the Plan within the meaning of 29 U.S.C. § 1002(21)(A). Hereafter, a person or group of people who exercise authority or control of Plan assets will be referred to as a "Plan Fiduciary" or "Plan Fiduciaries."

## ERISA'S PURPOSE AS APPLIED TO DEFINED CONTRIBUTION PLANS

27.    ERISA was enacted in 1974 to safeguard the interests of the beneficiaries of pension plans broadly, which includes defined contribution plans and 401(k) plans such as the Plan, and imposes standards of conduct on plan fiduciaries.

28.    ERISA includes a required disclosure framework to ensure that retirement plan participants can hold plan fiduciaries accountable for fulfilling their duties required under ERISA because it recognizes that plan participants and beneficiaries will often not have access to details about the conduct of plan fiduciaries. Accordingly, to ensure participants can hold fiduciaries accountable courts recognize that inferences may often be required from limited publicly available

6

information. *See Concha v. London*, 62 F.3d 1493, 1503 (9th Cir. 1995) ("Where a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct."); *Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 106-107 (2d Cir. 2021) ("([W]e are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct.").

29.     Over the past several decades defined contribution plans, like the Crane 401(k) Plan, have become the primary savings vehicle for most Americans and by 2022 there were more than 121 million participants who were relying on benefits from defined contribution plans to provide some or all of their retirement benefits. *See* https://www.congress.gov/crs-product/R48470; *LaRue v. DeWolff, Boberg & Assocs*., 552 U.S. 248, 255 (2008) ("Defined contribution plans dominate the retirement plan scene today.").

30.     Defined contribution plans allow employees to defer the payment of taxes on compensation contributed to the Plan. As a result, there are many IRS rules and regulations that define the requirements a plan must follow in order to receive the benefit of deferring taxes on contributions. To the extent that employers agree to make contributions to defined contribution plans, the employers also receive a tax benefit.

31.     A defined contribution plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may

7

be allocated to such participant's account." 29 U.S.C. § 1002(34). As such, a participants' retirement benefit in a defined contribution plan equals (1) the amount of the participants' voluntary contributions; *plus* (2) the amount of any employer contributions; *plus* (3) any investment returns on those contributions; *minus* (4) plan and investment expenses paid to third-party service providers. *Cunningham,* 604 U.S. at 697-98 (explaining that defined contribution participants "maintain individual investment accounts within those plans, the value of which is determined by the market performance of employee and employer contributions, less expenses. Those expenses include fees paid to service providers.").

32.    In addition, employers, like Crane, also derive many other indirect benefits by virtue of sponsoring defined contribution plans. For example, in addition to tax benefits it is well known that retirement plans are critical tools for employers to attract and retain high quality employees.

33.    While all defined contribution plans are drafted with a provision that provides the employer/sponsor the right to terminate the plan at any time, in practice plan sponsors rarely terminate plans because doing so would put them at a substantial competitive disadvantage and make it much more difficult to attract and retain talented employees.

34.    As relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that it is in the best interest of plan participants to enable them to participate in the potential for market earnings sooner rather than later and that general understanding applies to both contributions from employees as well as the allocation of Forfeited Plan Assets and employer contributions.

35.    For example, ERISA and DOL regulations reflect a clear and longstanding policy intent to ensure that the deferrals of Plan Participants are promptly invested pursuant to the

direction of each Plan participant and are not allowed to sit in unallocated plan-level accounts, which are typically invested in cash or a cash equivalent thereby depriving Plan Participants from the potential for investment earnings. *See, e.g.,* DOL Advisory Opinion 2002-02A (requiring that plan fiduciaries minimize the time between employee deferrals and investment pursuant to plan participant direction); *see also* 29 C.F.R. § 2510.3-102 (noting that plan assets "include participant contributions as of the earliest date they can reasonably be segregated" from the employer's general assets); Field Assistance Bulletin 2008-01 (noting that participant contributions "that are withheld from wages or paid to the employer are delinquent if they become plan assets while still in the hands of the employer").[3]

36. Additionally, as relevant to this case, under the circumstances prevailing well prior to the class period, it was and is understood that plan expenses can have a dramatic detrimental impact on the retirement benefits provided by defined contribution plans. For example, according to the U.S. Department of Labor, a 1% difference in fees over the course of a 35-year career makes

---

3 *See also*, IRS "Retirement News for Employers," Vol. 7, Spring 2010 (stating forfeitures "must be used or allocated in the plan year incurred. The Code does not authorize forfeiture suspense accounts to hold unallocated monies beyond the plan year in which they arise."); 29 C.F.R. § 2510.3-102 (61 Fed. Reg. 41220, Aug. 7 1996) (noting that "the Department is concerned that participant contributions be paid promptly into the plan so as to begin to earn interest or other investment returns and to be available for the payment of benefits."); Field Assistance Bulletin No. 2002-03 (noting concern about interest earned "on contributions pending investment direction" and requiring that float be "regarded by plan fiduciaries and service providers as part of the service provider's compensation"). Accordingly, interest (float) earned on Forfeited Plan Assets sitting in an unallocated plan-level account both inures to the benefit of the employer when the plan fiduciaries use that interest (float) to reduce the employer's contributions and also deprives plan participants of the potential for investment earnings.

a difference of *28%* in savings at retirement.[4] Over a 40-year career, this difference in fees can reduce a participant's retirement savings by almost $500,000.[5]

## FIDUCIARY STANDARD REQUIRED UNDER ERISA AND SECOND CIRCUIT

37.     As noted above, ERISA was enacted to protect the interests and benefits of employee benefit plan participants and established very important minimum standards for the conduct of plan fiduciaries.

38.     Under 29 U.S.C. §§ 1104(a)(1)(B), ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets," *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 419 (2014), which requires fiduciaries to "act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would. . . ." 29 U.S.C. § 1104(a)(1)(B).

39.     In fact, the strict fiduciary duties of prudence and loyalty required of plan fiduciaries by ERISA are among the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1488 (9th Cir. 1996); *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009) (citation and quotation marks omitted).  *See also*, *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006).

40.     Under ERISA's strict fiduciary duty requirements, when making the decision regarding the use of Plan assets, Defendants are required by ERISA, 29 U.S.C. §§ 1104(a)(1) to:

---

[4] U.S. Dept. of Labor *A Look at 401(k) Plan Fees,* at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

[5] Michael Bird, *Pandemic Highlights Reasons for Reviewing Plan Fees,* PLANSPONSOR, May 15, 2020, https://www.plansponsor.com/pandemic-highlights-reasons-reviewing-plan-fees/, *archived at* https://perma.cc/8VCU-E7PC.

"discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and

    (A) for the *exclusive purpose* of

        (i) providing benefits to participants and their beneficiaries; ***and***

        (ii) **defraying reasonable expenses** of administering the plan." (emphasis added).

41.    In the Second Circuit, "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct." *See Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 107 (2d Cir. 2021); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1070 (N.D. Cal. 2017) ("To state a claim for breach of fiduciary duty, a complaint does not need to contain factual allegations that refer directly to the fiduciary's knowledge, methods, or investigations at the relevant times . . . the court may be able to reasonably infer from the circumstantial factual allegations that the fiduciary's decision-making process was flawed.").

42.    Under ERISA, a person is a fiduciary to the extent he or she: (1) exercises any discretionary authority or control over management of the Plan or the management or disposition of its assets; (2) renders investment advice regarding Plan assets for a fee or other direct compensation, or has the authority or responsibility to do so; or (3) has any discretionary authority or control over Plan administration. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

43.    Under ERISA, fiduciaries who exercise any authority or control over plan assets or the administration of a plan must act prudently and for the exclusive benefit of participants in the plan. Fiduciaries cannot act for the benefit of themselves and must ensure that the amount of fees paid from plan assets are no more than reasonable. 29 U.S.C. § 1104(a)(1)(A)(ii); *see also id*. § 1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to

participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan" and shall not inure to the benefit of the employer).

44.    Under the plain language of the statute, the duty of prudence imposed by 29 U.S.C. § 1104(a)(1) requires that when fiduciaries are presented with alternatives (in conduct or interpretation), the fiduciaries must choose the alternative that solely considers the interests of plan participants exclusively to fulfill the requirement to both (1) provide "benefits to participants"; *and* (2) "defray reasonable expenses of administering the plan," if an alternative that achieves both purposes is available..

45.    ERISA, 29 U.S.C. § 1104 (a)(1)(D) also requires plan fiduciaries to discharge their duties "in accordance with the documents and instruments governing the plan . . ."

46.    Additionally,  29 U.S.C. § 1104 (a)(1)(D) makes explicit that the approach set forth above exists regardless of any terms of a written plan document that may be interpreted to the contrary, stating that the provisions of all plans must be "consistent with the provisions of this subchapter and subchapter III."

47.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for, among other things, knowingly participating in a breach by another fiduciary or enabling breaches by other fiduciaries.

## FACTS APPLICABLE TO ALL COUNTS[6]

48.     The Plan is a defined contribution plan pursuant to 29 U.S.C. §§ 1002(2)(A) and (34) and was created by Crane for the sole "benefit of its eligible employees and the eligible employees of its affiliated companies participating in the Plan."

49.     The Plan was created and funded several years prior to the class period.

50.     In accordance with 29 U.S.C. § 1103(a), the assets of the Plan are held in a trust fund "for purposes of receiving and holding in trust the assets held under the Plan." "The income and principal of the Trust Fund are for the sole use and benefit of the Participants and beneficiaries of the Plan."

51.     As an individual account defined contribution retirement plan, the Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

52.     Throughout the class period the Plan paid direct and/or indirect compensation to third-party services providers for services to administer the Plan ranging from, among others, recordkeeping and information management, administration, consulting, investment advisory, legal, trustee services, loan processing, and investment management services paid indirectly by the

---

[6] Unless otherwise specified, the facts in this section are taken from: (1) documents provided by Defendants to Plaintiff's counsel, including the Plan's operative governing documents during the class period; (2) Plaintiff's Plan documents; (3) the Plan's Form 5500s filed by Defendants with the Department of Labor and publicly available through the "DOL's" website at https://www.efast.dol.gov/5500Search/; and (4) other publicly available information about the Plan.

Plan. The Plan also paid other types of fees. Hereafter the payment for services from Plan assets (director or indirectly) shall collectively be referred to as "Administrative Expenses."

53. The third-party service providers (listed in the Plan's Form 5500), that were paid for Administrative Expenses include but are not necessarily limited to The Vanguard Group, Vanguard Advisors, CapFinancial Partners, Bender Graphics, and Troutman Pepper Hamilton Sanders. For example, the Plan disclosed that The Vanguard Group received $400,512 from Plan assets in direct compensation in 2024 as well as an undisclosed amount of indirect compensation.

54. The use of Plan assets to pay Administrative Expenses to third-party service providers from the accounts of Plan participants reduces the funds available to Plan participants for distribution and/or investing and deprives the Plan of funds that otherwise would have been earned on the amounts deducted.

55. Throughout the class period, the Plan has been funded by a combination of wage withholdings by Plan participants and Crane matching contributions ("Employer Matching Contributions") as well as two types of Crane discretionary contributions (Employer Discretionary Contributions") (together, "Crane Contributions"), each of which is deposited into the Plan's trust fund and allocated to individual participant accounts.

56. Throughout the class period, the terms of the Plan required Crane to make Employer Matching Contributions to the Plan based on each participant's contributions.

57. Under the terms of the Plan, Crane intended to fund its Employer Matching Contributions "as soon as reasonably possible after the last day of each payroll period." Crane was required to pay Employer Discretionary Contributions that have accrued throughout a calendar year or have been declared by Crane to the Plan trustee "not later than the time prescribed by the [IRS] Code for filing the Company's income tax return . . . ."

14

58.   Upon information and belief, throughout the class period Crane also made Employer Discretionary Contributions comprised of "Discretionary Company Contributions" and required "Enhanced Company Contribution," as defined in the Plan.

59.   In each year during the class period that Crane declared an Employer Discretionary Contribution, Crane was contractually obligated to make Employer Discretionary Contribution to the Plan.

60.   Upon their deposit into the Plan's trust fund, all participant contributions and Crane Contributions become assets of the Plan.

61.   Under the terms of the Plan, participants are immediately vested in their own contributions, as well as any actual earnings thereon. Participants are vested in Crane Contributions and any actual earnings thereon based on various schedules, dependent on their employer group, typically ranging from four to six years before being fully vested.

62.   To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of Crane Contributions and any actual earnings thereon (hereafter "Forfeited Plan Assets") in his or her account on the earlier of the date the participant takes a distribution of his or her vested interest in the Plan or the date the participant incurs a five-consecutive-year break in vesting service (within the meaning of the Plan document).

63.   As the employer (also known as the settlor as that meaning is understood from trust law and used by the DOL in guidance), Crane drafted and amended the Plan and intended it to qualify under the [IRS] Code Section 401(a).

64.   Well prior to the class period, like all prudent defined contribution plan fiduciaries and employer/settlors, knew that a defined contribution "plan will not be qualified unless all funds

are allocated to participants' accounts in accordance with a definite formula in the plan." IRS Field Assistance Bulletin 2008-01, page 4.

65.     Similarly, all prudent defined contribution plan fiduciaries and employers knew that to ensure their plans remained qualified under the IRS Code, there were only a few allowable uses of Forfeited Plan Assets, among them being to defray plan expenses or reduce employer contributions. *Id.*

66.     Accordingly, when designing their plan, employers had a few limited options to choose from with respect to the treatment of Forfeited Plan Assets.

67.     For example, employers that wanted all Forfeited Plan Assets to be used first to reduce employer contributions prior to defraying plan expenses could (and have) easily drafted the terms of the plan to explicitly require that. Of course, the opposite is also true. Employers could draft their plans to preclude or limit Forfeited Plan Assets from being used to reduce employer contributions. Accordingly, just because using Forfeited Plan Assets to reduce employer contributions is permissible in some cases, does not make it always permissible in all cases.

68.     Additionally, employers that chose to provide discretion to plan fiduciaries with respect to Forfeited Plan Assets clearly intended their plan fiduciaries to use a prudent process to determine which of several uses of Forfeited Plan Assets would satisfy the terms of the Plan.

69.     In other words, a plan fiduciary that exercises discretion to defray plan expenses is not providing a benefit greater than what was required or intended by the employer/settlor. As noted above, Employers were always aware that they could design the plan to prevent the use of Forfeited Plan Assets to defray plan expenses.

70.     From at least 2019 through 2023, the Plan document gave Plan Fiduciaries discretion on how to use Forfeited Plan Assets for any "proper Plan purpose", *i.e.,* Plan Fiduciaries

16

had full discretion and ability to use the Forfeited Plan Assets to reduce Plan Administrative Expenses.

71. From at least 2019 through 2023, the Plan's Summary Plan Description, provided to all Plan participants for the purpose of describing the "key terms and provisions of the Plan," informed Plan participants that "[a]ny amounts which are forfeited will be credited against any succeeding Company Contributions to the Plan, used to pay Plan expenses, or for any other proper Plan purposes."

72. Throughout the class period, Crane, as the employer/drafter of the Plan, did not allow Forfeitures to be used to reinstate the accounts of terminated employees that were rehired within five years of termination.

73. As a result, practically speaking, the only "proper Plan purpose" for the use of Forfeited Plan Assets other than offsetting Employer contributions was to defray the expenses of administering the Plan.

74. Additionally, both ERISA and the IRS Code contemplate the use of Forfeited Plan Assets to defray plan expenses as a potential benefit under a defined contribution plan. As a result, the clear intention of employers who give discretion to plan fiduciaries to defray plan expenses is to make defraying plan expenses one of the benefits provided under the terms of the Plan.

75. Throughout the entire class period, the Plan also required that "no part of the corpus or income of the Trust Fund . . . be used for, or diverted to, purposes other than the exclusive benefit of the Participants and their beneficiaries, ***and*** defraying the reasonable expenses of administering the Plan." (emphasis added).

17

76.     When considered holistically using the available evidence, it is clear that Crane intended Forfeited Plan Assets to be considered as an option for covering the costs of administering the Plan.

77.     Accordingly, throughout the entire class period a prudent fiduciary would have always considered whether to use Forfeited Plan Assets to defray plan expenses prior to reducing Company contributions. And, of course, after the 2024 amendment (see below), the plan fiduciaries were required to first use Forfeited Plan Assets to defray the costs of administering the Plan.

78.     In every year prior to and throughout the class period, a prudent fiduciary would conduct an evaluation of how the costs of administering the Plan would be paid. Under ERISA and the explicit provisions of the Plan, the Plan Fiduciaries were required to conduct that analysis solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

79.     In every year prior to and throughout the class period, the terms of the Plan provided that the expenses of administering the Plan would be paid by the Plan "to the extent not paid by" Crane. Accordingly, at a minimum of once a year a prudent fiduciary would inquire of Crane if it would cover any of the costs of administering the Plan.  If Crane declined, then a prudent fiduciary would conduct an evaluation of how the costs of administering the Plan would be paid. Under ERISA and the explicit provisions of the Plan, the Plan Fiduciaries were required to conduct that analysis solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

80.    In every year prior to and throughout the class period, that analysis, when conducted prudently, would reveal that the preferential option of using Forfeited Plan Assets to defray Plan expenses would be more consistent with the requirements of both ERISA and the Plan.

81.    A prudent plan fiduciary would determine that using Forfeited Plan Assets to defray expenses on an ongoing basis is more consistent with discharging their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan because that option enables Plan participants to have more assets available for market gains for a longer period of time than allowing Forfeited Plan Assets to accrue in an unallocated plan account throughout the year to be used later (in some cases as many as 12 months later) to reduce Employer contributions.

82.    A prudent Plan fiduciary having made that determination would have then informed the employer/settlors that Forfeited Plan Assets would be used first to defray plan expenses prior to being used to reduce employer contributions.

83.    In every year immediately prior to and throughout the class period, at least once a year, at the time the Crane would be prepared to make its Crane Contributions, a prudent Plan fiduciary would have then coordinated with the Plan's recordkeeper to determine how much, if any, of the Forfeited Plan Assets would be available to reduce Employer contributions after consideration of the use of Forfeited Plan Assets to be used to defray plan expenses on an ongoing basis.

84.    Having conducted this prudent analysis in every year immediately prior to and throughout the class period, the Plan Fiduciaries should have required Crane to contribute the full

amount of both its required Matching Employer Contributions as well as its declared discretionary Employer Contributions.[7]

85.     After having conducted this prudent analysis, the Plan Fiduciaries would have been obligated to ensure that Crane remitted contributions to the Trust and had a duty and responsibility for the collection of such contributions.[8]

86.     In fact, however, the Plan Fiduciaries imprudently and disloyally coordinated with Crane in a way that did not enable the Forfeited Plan Assets to be used to defray Plan Administrative Expenses.

87.     In other words, the Plan Fiduciaries improperly, imprudently, and disloyally coordinated with the Crane and the Plan's recordkeeper to calculate how much of the Forfeited Plan Assets would be used to reduce Crane Contributions and provided that direction to the Plan's recordkeeper.

88.     It is reasonable to infer that the Plan Fiduciaries imprudently engaged in this conduct due to their conflict of interest based on their desire to defray amounts owed to the Plan by Crane. The only reasonable explanation and inference to be drawn from the conduct of the Fiduciaries is that they discharged their duties considering the best interests of Crane as opposed to solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of

---

[7] Unless the Forfeited Plan Assets were less than the foreseeable future ongoing Plan Administrative Expenses, which is only possible for one of the years of the class period. Defendants are solely in the possession of the documents to be able to make that determination.

[8] *See*, Field Assistance Bulletin 2008-01 stating ("when an employer fails to make a required contribution to a plan in accordance with the plan documents, the plan has a claim against the employer for the contribution, and that claim is an asset of the plan."). https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2008-01

providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

89.    In every year prior to and throughout the class period, there are no facts or circumstances that are publicly available or provided by Defendants that would support a decision by independent and unconflicted Plan Fiduciaries to fail to use Forfeited Plan Assets to defray plan expenses on an ongoing basis.

90.    In every year prior to and throughout the class period, there are no facts or circumstances that are publicly available or have been provided by Defendants that would support a finding that failing to use Forfeited Plan Assets to defray Plan expenses was more consistent with the Plan Fiduciaries' duty to discharge their duties solely in the interest of the participants and beneficiaries and for (1) the exclusive purpose of providing benefits to participants and their beneficiaries; and (2) defraying reasonable expenses of administering the Plan.

91.    Instead, the facts and circumstances here are more consistent with the Plan Fiduciaries trying to increase Crane's profit, despite their fiduciary duties to act solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan.

92.    In fact, decisions related to Crane Contributions are made without reference to the amount of Forfeited Plan Assets. It is only after Crane contribution levels (settlor decisions on funding) are made and/or declared that the Plan Fiduciaries are then required to determine whether or not to use Forfeited Plan Assets to defray plan expenses as opposed to using Forfeited Plan Assets to offset the amount of Crane Contributions that has already been approved by Crane.

93.    Effective January 1, 2024, the Plan document required the Plan Fiduciaries to use Forfeited Plan Assets "***first*** to pay the administrative expenses of the Plan, and ***then*** to reduce

Company contributions under the Plan", *i.e.*, Plan Fiduciaries had no discretion with respect to the Forfeited Plan Assets and were required to pay all Plan Administrative Expenses before using Forfeited Plan Assets for Crane.

94.     In 2023 and 2024, the Plan's Forms 5500 informed the DOL and Plan participants that Forfeited Plan Assets are used "***first*** to pay the administrative expenses of the Plan, and then to reduce future Company contributions."

**B.    Plan Fiduciaries Disloyal, Imprudent, Conflicted, and Prohibited Use of Forfeitures During Class Period**

95.     Under ERISA, and the explicit terms of the Plan, when making decisions regarding the use of Forfeited Plan Assets, the Plan Fiduciaries have been and are required by 29 U.S. Code § 1104 to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan.

96.     The totality of the circumstances demonstrates that Defendants failed to administer the Plan in a prudent manner.

97.     Defendants consistently used Forfeited Plan Assets to almost exclusively reduce Crane's contractually obligated contributions to the Plan and not to defray Administrative Expenses.

98.     Yet throughout the class period, the Defendants consistently did not use the Forfeited Plan Assets to offset Plan Administrative Expenses prior to using the Forfeited Plan Assets to reduce Crane's contractually obligated contributions to the Plan resulting in a reduction in the value of Plaintiff and the Plan's accounts.

99.     Instead, the Plan Fiduciaries have consistently chosen to utilize all Forfeited Plan Assets to benefit Crane by reducing Crane's contractually obligated contributions to the Plan and paying Plan Administrative Expenses from Plan assets *other* than Forfeited Plan Assets, i.e., participants' accounts.

100.    During the class period, the terms of the Plan obligated Crane to make contributions to the Plan in the following amounts: (1) in 2019, at least $24,409,258[9]; (2) in 2020, at least $25,848,768; (3) in 2021, at least $26,271,805; (4) in 2022, at least $28,670,106; (5) in 2023, at least $23,612,918; and (6) in 2024, at least $22,140,922.

101.    During the class period, the Plan Fiduciaries had the discretion and ability to require Crane to make matching contributions equal to 50% of the elective deferral contributions made by Participants each year. Instead, the Plan Fiduciaries allowed Crane to offset its obligation to make contributions by allocating Forfeited Plan Assets in the following amounts: (1) in 2019, $1,145,540; (2) in 2020, $1,522,295; (3) in 2021, $4,252,053; (4) in 2022, $1,805,008; (5) in 2023, $1,356,704; and (6)  in 2024, $1,580,858. These actions saved Crane the respective amounts, which flowed directly to its bottom-line profit.

102.    During the class period, the Plan Fiduciaries were required under the terms of the Plan and ERISA to direct the use of Forfeited Plan Assets in the following minimum amounts: (1) in 2019, approximately $1,437,325[10]; (2) in 2020, approximately $1,819,435; (3) in 2021,

---

[9] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the amount of $1,437,325 represents the $1,145,540 of Forfeited Plan Assets that were used during the year plus the $291,785 in unallocated Forfeited Plan Assets in the plan on December 31, 2019. This methodology was used for each subsequent year.

[10] Derived from the Plan's 2019-2024 Forms 5500s. For 2019, the amount was derived from the $167,543 in unallocated Forfeited Plan Assets listed in the Plan's 2019 Form 5500 carried over from 2018, the 1,145,540 of Forfeited Plan Assets that were used to reduce Employer Contributions, and the $291,785 in unallocated Forfeited Plan Assets in the plan on December

approximately $4,711,168; (4) in 2022, $2,537,736; (5) in 2023, $2,203,190; and (6) in 2024 $2,552,827

103.    During the class period, the Plan Fiduciaries caused Plan Participants to pay Plan Administrative Expenses through deductions from their accounts and indirectly through revenue sharing or similar methods. The minimum direct amounts paid by participants were: (1) in 2019, $961,262; (2) in 2020, $920,686; (3) in 2021, $1,057,236; (4) in 2022, $1,047,657; (5) in 2023, $964,203; and (6) in 2024, $947,405.[11]

104.    During the class period, the Plan Fiduciaries disloyally and imprudently used Forfeited Plan Assets to offset Crane's contribution obligations prior to first offsetting all Plan Administrative Expenses or allocating the Forfeited Plan Assets to eligible Plan Participants. The amounts used to offset Crane's obligations were: (1) in 2019, $1,145,540; (2) in 2020, $1,522,295; (3) in 2021, $4,252,053; (4) in 2022, $1,805,008; (5) in 2023, $1,356,704 and (6) in 2024, $1,580,858.

105.    As of December 31 of each year in the class period, unallocated Forfeited Plan Assets remained unused in the following amounts: (1) in 2019, $291,785; (2) in 2020, $297,140; (3) in 2021, $459,115; (4) in 2022, $732,728; (5) in 2023, $846,486; and (6) in 2024, $971,969.

106.    From 2019 through 2023, the Plan Fiduciaries did not use any Forfeited Plan Assets to reduce Plan Administrative Expenses.

---

31, 2019, which implied inflows of approximately $1,269,782 during 2019. This methodology was used for each subsequent year.

[11] The amount of Plan Administrative Expenses specifically identified in this Complaint likely understates the actual Plan Administrative Expenses paid by Plan participants because the amounts do not include undisclosed indirect compensation paid by Plan participants.

107.    Likewise, during 2024, the Plan Fiduciaries violated the Plan document and failed to "first pay" all Plan Administrative Expenses before using Forfeited Plan Assets for Crane's benefit.

108.    The following chart demonstrates the Plan Fiduciaries' disloyal and conflicted use of forfeitures during the class period:

| YEAR | FORFEITURES USED BY CRANE TO OFFSET CRANE CONTRIBUTIONS | FORFEITURES DISCLOSED USED FOR PLAN ADMIN EXPENSES | THIRD-PARTY EXPENSES PAID BY THE PLAN OR PARTICIPANTS | FORFEITURE BALANCE AT YEAR END LEFT IN AN UNALLOCATED ACCOUNT |
|---|---|---|---|---|
| 2019 | $1,145,540 | $0 | $961,262 | $291,785 |
| 2020 | $1,522,295 | $0 | $920,686 | $297,140 |
| 2021 | $4,252,053 | $0 | $1,057,236 | $459,115 |
| 2022 | $1,805,008 | $0 | $1,047,657 | $732,728 |
| 2023 | $1,356,704 | $0 | $964,203 | $846,486 |
| 2024 | $1,580,858 | $0 | $947,405 | $971,969 |
| **Total** | **$11,662,458** | **$0** | **$5,898,449** | **$3,599,223** |

109.    Upon information and belief, the Plan Fiduciaries have continued to violate the explicit terms of the Plan Document by failing to use Forfeited Plan Assets to first pay the administrative expenses of the Plan.

110.    In their motion to dismiss Plaintiff's original complaint (ECF No. 32-1), Defendants argue that the amount of Administrative Expenses they failed to defray was actually less than what they reported to the DOL in the Plan's Form 5500s because it should only include

purely "recordkeeping" fees. Even if that is true (which it is not)[12], Defendants' conduct in not defraying an alleged smaller amount would be even more egregious as Defendants would still have failed to defray at least $3,755,865 in expenses paid to Vanguard Group in direct compensation plus an undisclosed amount of indirect compensation during the class period while enriching Crane with over $11 million and allowing over $3.5 million of Forfeited Plan Assets to sit in an unallocated plan account for several months prior to being used to offset Crane Contributions. Prudent Plan Fiduciaries would have determined that allowing millions of dollars to sit in an unallocated plan account for several months each year was not consistent with their duty to act solely in the interest of Plan participants and for the exclusive purpose of providing benefits *and* defraying plan expenses.

## C.   Defendants' Plan and ERISA Fiduciary Violations Based on Forfeiture Use

111.   Under the terms of the Plan and the provisions of ERISA, throughout the class period the Plan Fiduciaries exercised discretion over, and control of, Plan assets when directing the use of Forfeited Plan Assets to pay Administrative Expenses to third-party service providers and to use Forfeited Plan Assets for Crane's benefit.

112.   The Plan Fiduciaries improperly, disloyally, and imprudently exercised that discretion to benefit Crane at the expense of the Plan and Plan Participants by failing to use unallocated Forfeited Plan Assets to pay Administrative Expenses or allocate back to Plan Participants and, instead, exercised that discretion to use Forfeited Plan Assets to reduce required Employer Matching Contributions.

---

[12] It is worth noting that, in practice, most plans disclose both the amount of Forfeited Plan Assets used to defray plan expenses as well as the amount used to offset company contributions regardless of the specific requirements of the instructions of the Form 5500 which do not necessarily mimic the auditors' independent professional responsibilities. Only through discovery in litigation will the true amount be uncovered.

113.    A prudent fiduciary would investigate whether there was a risk that Crane would be unable to satisfy its contribution obligations if forfeitures were used to pay Administrative Expenses as instructed by the Plan, or evaluate whether there were sufficient forfeitures to eliminate the Plan's Administrative Expenses charged to participants and still offset a portion of Crane's own contribution obligations.

114.    When other defined contribution plans allow for forfeiture assets to be used to reduce matching contributions or pay plan administrative expenses, prudent fiduciaries have chosen to use forfeitures to pay plan administrative expenses.

115.    Throughout the entire class period, the discretion given to the Plan Fiduciaries under the terms of the Plan and ERISA created a conflict of interest with respect to the Plan Fiduciaries' use of Forfeited Plan Assets. In other words, if the Plan Fiduciaries exercised their discretion to choose to allocate over $11 million of Forfeited Plan Assets (from 2019 through 2024) towards Crane's Employer Matching Contributions, that decision would positively benefit the bottom-line profits of Crane by that amount.

116.    On the other hand, to the extent the Plan Fiduciaries exercised their discretion granted to them by Crane under the terms of the Plan to use the Forfeited Plan Assets to reduce both the direct and indirect Administrative Expenses incurred by Plan Participants throughout the class period, that conduct would result in the Plan Participants receiving the full value of their defined contribution benefits promised to them under the terms of the Plan and as required by ERISA and Supreme Court precedent (*i.e.*, acting solely in the interest of plan participants *and* for the exclusive purpose of providing retirement benefits and defraying reasonable expenses of administering the Plan). *See* 29 U.S. Code § 1104(a)(1).

117. If the Plan Fiduciaries had not acted contrary to the Plan or, alternatively, not used their discretion (despite having multiple other options available under the Plan and ERISA) to reduce Employer Matching Contributions with plan assets, then over $11 million in additional assets (from 2019 through 2024) would have been contributed to the Plan and would have been invested by the Plan Participants.

118. Crucially, had the Plan Fiduciaries used their discretion to use the over $11 million (from 2019 through 2024) in Forfeited Plan Assets to defray Administrative Expenses or allocate the over $11 million in Forfeited Plan Assets back to Plan Participants to defray Administrative Expenses, that would not have caused Crane to pay more than what Crane promised under the terms of the Plan and its declared contributions. Rather, the Plan Fiduciaries' decision to allow Crane to offset Crane Contributions with Forfeited Plan Assets caused Crane to pay over $11 million less than what Crane promised to contribute to the Plan under the terms of the Plan.

119. Loyal fiduciaries following a prudent process would not choose to exclusively offset declared Crane Contributions instead of reducing the Plan Participants' Administrative Expenses or, alternatively failing to allocate the Forfeited Plan Assets back to the accounts of Plan Participants to be used to defray Administrative Expenses, which reduced the value of both the Plan as a whole and the accounts of individual Plan Participants.

120. Defendants' conduct, at the very least, necessitates the inference that they either did not have processes in place to weigh the benefits to participants in allocating forfeitures, or that they ignored their duty to act exclusively for the Plan participants because the Plan Fiduciaries were motivated by self-interest and/or the interest of Crane when allocating Forfeited Plan Assets.

121. To the extent that Defendants exercised their discretion, they exercised it almost solely for the exclusive purpose of reducing declared Crane Contributions to the Plan, thereby

saving Crane millions of dollars at the expense of the Plan and Plan Participants and not for the purpose of defraying Plan participants Administrative Expenses.

122. Consequently, throughout the class period, an objective analysis of the available options throughout the class period, guided solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants *and* defraying reasonable expenses of administering the Plan would indisputably not result in Plan Fiduciaries choosing to use *all* Forfeited Plan Assets available to reduce future Employer Contributions throughout the class period instead of using Forfeited Plan Assets to defray Administrative Expenses.

123. Additionally, under the minimum standard of care under the circumstances then prevailing, a prudent plan fiduciary having the discretion to select among several options related to the allocation of Forfeited Plan Assets, acting solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and defraying reasonable expenses of administering the plan, would choose options that would ensure that Forfeited Plan Assets were to allocated during the same year in which they arose.

124. In other words, here the facts suggest that throughout the class period, the Plan Fiduciaries improperly, disloyally, and imprudently exercised discretion when deciding to use Forfeited Plan Assets to exclusively reduce Employer Matching Contributions when other options were available.

125. As described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce Crane Contributions was, all else being equal, in the best interest of Crane because that option decreased Crane's own declared contribution costs.

126.    Similarly, as described in detail above, throughout the class period, the Plan Fiduciaries' decisions to use Forfeited Plan Assets to reduce Crane Contributions over paying Administrative Expenses or allocating the Forfeited Plan Assets to the accounts of eligible Plan Participants reduced the value of Plan assets and the accounts of Plan Participants and the benefits available to Plan Participants.

127.    Further, as described in detail above, throughout the class period, the Plan Fiduciaries exercised discretion over, and control of, Plan Assets when directing the use of Participants' accounts to pay Administrative Expenses to third-party service providers.

128.    Throughout the class period the Plan Fiduciaries caused the Plan to engage in thousands of transactions that used plan assets to constitute a furnishing of services between the plan and a party in interest.  At the same time, through these thousands of transactions paying Administrative Expenses from the accounts of Plan participants to third-party service providers, the Plan Fiduciaries also caused the Plan to engage in transactions that constitute a direct or indirect use of Forfeited Plan Assets for the benefit of a party in interest (*i.e.*, Crane).

129.    Likewise, after the Plan Fiduciaries improperly exercised discretion and control over Plan assets by causing the payment of Administrative Expenses from the accounts of Plan participants, the Plan Fiduciaries then caused the Plan to engage in several transactions with a Party in interest (*i.e.*, Crane), that for the benefit of Crane, allowed Crane to use Forfeited Plan Assets to offset and reduce the amount of Crane Contributions (Plan assets) transferred to the Plan.

130.    The facts and circumstances here are more consistent with the Plan Fiduciaries trying to increase Crane's profit, despite their fiduciary duties to act *solely* in the interest of the participants and beneficiaries **and for the *exclusive* purpose of providing benefits**

**to participants** and their beneficiaries *and* **defraying reasonable expenses** of administering the Plan.

131.    While Defendants benefited, the Plan and its participants and beneficiaries suffered. If Defendants decided throughout the class period to use Forfeited Plan Assets to defray the reasonable expenses of administering the Plan, the value of the Plan and the value of the participants' individual accounts would have been greater. Not because the Plan Participants would receive an additional benefit but because they would receive the full benefit they were entitled to under the Plan and ERISA for a defined contribution plan participant.

132.    To be clear, Plaintiff does not allege that ERISA prohibits fiduciaries from *ever* using forfeitures to offset employer contributions. Rather, Plaintiff alleges that under the specific facts and context of this Plan, a loyal and prudent fiduciary would not make the decisions that the Plan Fiduciaries made (as alleged above). Here, under the circumstances described, Defendants have breached their fiduciary duties, ERISA's prohibited transaction rules, and the Plan's own terms. *See e.g., Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 108-09 (2d Cir. 2021) ("Second, we caution against overreliance on . . . other ERISA cases as benchmarks. While such comparisons may sometimes be instructive, their utility is limited because the assessment of any particular complaint is a context-specific task. We cannot rule out the possibility that a fiduciary has acted imprudently by including a particular fund even if, for example, the fees that fund charged are lower than a fee found not imprudent in another case.").

133.    A prudent and loyal fiduciary acting exclusively in the best interest of the participants would choose to offset Administrative Expenses to the extent that there is no concern that Crane would otherwise be unable to meet its future contribution obligations.

134.    Similarly, a loyal and prudent fiduciary could offset the amount necessary to prevent Crane from being unable to meet its future contributions and then allocate the remaining funds to other more beneficial options, like reducing Administrative Expenses shouldered by the Plan participants.

135.    Upon information and belief, Crane was able to meet its future contributions throughout the class period and would have been able to meet its Crane Contributions each year, even if no forfeitures were applied to offset its contributions.

136.    These facts and actions show, or, at a minimum, necessarily require the inference, that the Defendants either had no prudent processes in place to discharge of the Forfeited Plan Assets timely or acted disloyally preferring to use all the Forfeited Plan Assets remaining to offset the Company's next year contributions beyond what was necessary rather than benefiting the Plan participants.

137.    Plan participants were also not informed of the decision-making process that Defendants employed to assess how to apply forfeiture assets. And they need not plead with more particularity regarding Defendants' decision-making process at this time. *See Sacerdote v. N.Y. Univ.,* 9 F.4th 95, 106-107 (2d Cir. 2021) ("([W]e are cognizant that ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences" and "a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct."). Further, Defendants' repeated decision to use forfeiture assets to offset Crane Contributions illustrates that Defendants either failed to engage in a thorough, independent decision-making process regarding how to apply forfeitures, or did so and ignored the results, in

32

express contravention of the duty to act solely and exclusively for the benefit of Plan participants.

138.    Additionally, as a result of the amendment to the plan effective January 1, 2024, the Plan Fiduciaries were required to use Forfeited Plan Assets "first to pay the administrative expenses of the Plan, and then to reduce Company contributions under the Plan."

139.    As detailed above, the Plan Fiduciaries failed to follow the terms of the Plan when they failed to first use the Forfeited Plan Assets to cover the Administrative Expenses.

## TRANSACTIONS PROHIBITED BY ERISA

140.    In addition to ERISA's fiduciary duties, Congress enacted even more stringent additional safeguards to avoid transactions that are highly susceptible to abuse by ERISA fiduciaries. Specifically, ERISA "Section 1106 supplements [a] fiduciary's general duty of loyalty to the plan's beneficiaries . . . by categorically barring certain transactions deemed 'likely to injure the pension plan." *Cunningham,* 604 U.S. at 697.

141.    ERISA Section 406(a), 29 U.S.C. § 1106(a)(1), prohibits transactions that benefit a party in interest. 29 U.S. Code § 1106(a)(1)(A)-(E).

142.    ERISA Section 406(b), 29 U.S.C. § 1106(b) prohibits a fiduciary of the plan from dealing with the assets of the plan in any way that benefits the fiduciary or is adverse to the plan participants' interest.  29 U.S. Code § 1106(b)(1)-(3).

143.    Section [1106](b) prohibits a plan fiduciary from engaging in various forms of self-dealing. Its purpose is to 'prevent[] a fiduciary from being put in a position where he has dual loyalties and, therefore, he cannot act exclusively for the benefit of a plan's participants and beneficiaries.'" *Reich v. Compton*, 57 F.3d 270, 287 (3d Cir. 1995) (Alito, J.), quoting H.R. Rep. No. 93-1280 (1974)).

144. According to the United States Department of Labor (the "DOL"), ERISA's Section 406(b)'s

> [P]rohibitions are imposed upon fiduciaries to deter them from exercising the authority, control, or responsibility which makes such persons fiduciaries when they have interests which may conflict with the interests of the plans for which they act. In such cases, the fiduciaries have interests in the transactions which may affect the exercise of their best judgment as fiduciaries.

29 C.F.R. § 2550.408b-2(e)(1).

145. ERISA Section 3(14) defines a party in interest to include the Plan employer (in this case Crane), a Plan fiduciary (in this case Crane and the Committee), and the Plan's third-party administrators (as listed in the Plan's Forms 5500).

146. Under ERISA, anyone who exercises discretion or control over plan assets, including the Plan sponsor (Crane) and Committee, is a fiduciary. 29 U.S.C. § 1002(21)(A).

147. The Supreme Court instructs that "[a]t the pleading stage, [] it suffices for a plaintiff plausible to allege the three elements" of a prohibited transaction claim "no more, no less." *Cunningham*, 604 U.S. at 709.

## DEFENDANTS ENGAGED IN SELF-DEALING AND CAUSED MANY PROHIBITED TRANSACTIONS IN VIOLATION OF ERISA

148. Throughout the class period, the Plan Fiduciaries directed and authorized tens of thousands of transactions extracting money from the accounts of Plan participants to pay over $5,000,000 for Plan Administrative Expenses to the Plan's third-party service providers that should have been covered fully or in part by Forfeited Plan Assets.

149. These transactions are memorialized in the statements received by each Plan participant and are also memorialized in Plan level accounting, *e.g.*, a trust report of the Plan.

150.    Moreover, throughout at least a portion of the class period, Defendants directed and authorized Plan participants to pay an indeterminable amount of indirect compensation for Plan Administrative Expenses which could have also been defrayed by Forfeited Plan Assets.

151.    Had the Defendants acted in accordance with the terms of the Plan document and ERISA the Defendants should have directed the use of Forfeited Plan Assets to defray the Plan Administrative Expenses that Defendants instead required Plan participants to pay through transactions from their individual accounts or through indirect compensation.

152.    Throughout the class period, Defendants also caused the Plan to engage in at least 24 transactions each year with Crane, a party in interest, related to Crane's contractual obligation to make matching contributions to the Plan. For each of these transactions, the Plan Fiduciaries coordinated with the third-party recordkeeper and Crane to calculate how much Crane could reduce its obligatory payment to the Plan by offsetting the full amount owed with the use of Forfeited Plan Assets.

153.    In each of these instances, Defendants caused the Plan to engage in a transaction with Crane that directly resulted in a smaller amount of money being paid by Crane into the Plan.

154.    In other words, at least 24 times each year the Plan Fiduciaries engaged in calculations for the express purpose of calculating how much money Crane could save from its contractual obligation to the Plan by using Forfeited Plan Assets to offset the amount of Crane's contribution.

155.    As noted above, each of these transactions is also memorialized in Plan trust reports.  Each of these transactions then serves to provide the assets necessary to execute thousands of transactions to invest Crane contributions and Forfeited Plan Assets pursuant to the investment instructions of Plan participants.

156.    In other words, each of these transactions involves the receipt of Crane contributions and calculations related to Forfeited Plan Assets to enable a combination of Forfeited Plan Assets and Crane contributions to be combined for use in following the investment instructions of thousands of Plan participants.

157.    As part of the same conduct, at least 24 times a year Defendants caused the Plan to engage in transactions that both directly and indirectly provided a benefit to a party in interest, *i.e.,* Crane, in the amount of Forfeited Plan Assets used to reduce Crane's contractual obligation to the Plan.

158.    In other words, throughout the class period the Plan Fiduciaries engaged in the conduct of making calculations that caused the Plan to receive at least $11,000,000 less in Crane contributions than what Crane was obligated to make and which increased Company profits by at least $11,000,000.

159.    Additionally, the Defendants caused the Plan to engage in these transactions with Crane that constituted and resulted in the use of Forfeited Plan Assets for the direct and indirect benefit of Crane, a party in interest and Plan Fiduciary.

160.    Throughout the class period, by directing, authorizing, and causing over one hundred transactions with Crane and tens of thousands of transactions with Plan participants, Defendants dealt with the Forfeited Plan Assets in their own individual interest and in Crane's interest by using Forfeited Plan Assets to offset Crane's contractual obligations to the Plan.

161.    Throughout the class period, by directing, authorizing, and causing over one hundred transactions with Crane and tens of thousands of transactions with Plan participants, the individual Plan Fiduciaries acted in their individual capacity and as agents of a party in interest, *i.e.*, Crane, whose interests are adverse to the Plan or Plan Participants.

162.   Throughout the class period, by directing, authorizing, and causing over one hundred transactions with Crane and tens of thousands of transactions with Plan Participants, the individual Plan Fiduciaries received consideration for their own personal accounts from Crane as a result of their control over the transactions described above with a party in interest, *i.e.*, Crane, involving the Forfeited Plan Assets, that enabled Crane to reduce its costs and increase its profits thereby benefiting each individual Plan Fiduciary.

## CLASS ACTION ALLEGATIONS

163.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

164.   In acting in their representative capacity for the Plan, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representative of, the following class:

> All participants and beneficiaries of the Crane Savings and Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 20, 2019 and running through the date of judgment.

165.   The class includes over 9,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

166.   There are questions of law and fact common to this class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Thus, common questions of law and fact include but are not limited to the following:

> a.   Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

37

b.  Whether Defendants breached their duty to follow the terms of the Plan;

c.  Whether Defendants breached their fiduciary duties to the Plan with respect to their management and allocation of Forfeited Plan Assets;

d.  Whether Plan Fiduciaries engaged in prohibited transactions with Forfeited Plan Assets;

e.  What are the losses to the Plan resulting from each alleged breach of ERISA; and

f.  What Plan-wide equitable and other relief the Court should impose to remedy Defendants' alleged breaches.

167.  Plaintiff's claims are typical of the claims of the class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a participant during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

168.  Plaintiff will adequately represent the class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he was a participant in the Plan during the class period, has no interest that conflicts with the class, is committed to the vigorous representation of the class, and has engaged experienced and competent lawyers to represent the class.

169.  Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

170.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

171.    Plaintiff's attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the class.

## COUNT I
### Breach of the Duty to Follow Terms of the Plan Document
### (29 U.S.C. 1104(a)(1)(D))

172.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

173.    As alleged herein, 29 U.S.C. 1104(a)(1)(D) imposes a fiduciary duty to act in accordance with the Plan documents and instruments governing the Plan.

174.    The Plan required the Defendants to use the Forfeited Plan Assets from Plan year 2024 forward to pay all Plan Administrative Expenses (both direct and indirect) prior to using Forfeited Plan Assets to reduce Crane's required contributions. Defendants failed to discharge their duty to act in accordance with the Plan document by using Forfeited Plan Assets to reduce employer contribution obligations in violation of the explicit terms of the Plan.

175.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty to follow the terms of the Plan document.

176.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties, knew of the breach by the other Defendants and

39

failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

177. Plaintiff and the class has suffered losses as a direct result of the Defendants' breach of their fiduciary duty to follow the terms of the Plan document.

## COUNT II
### Breach of ERISA's Fiduciary Duty of Loyalty
### (29 U.S.C 1104(a)(1)(A))

178. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

179. When exercising discretion and control over Forfeited Plan Assets and using them to reduce Crane contributions, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan participants, the Plan Fiduciaries considered the best interest of Crane as opposed to participants, in violation of ERISA.

180. When improperly exercising discretion and control over Forfeited Plan Assets and failing to use them to defray the reasonable costs of administering the Plan or allocating them back to the accounts of eligible Plan participants, the Plan Fiduciaries considered the best interests of Crane, as opposed to Plan participants, in violation of ERISA.

181. When exercising control over Forfeited Plan Assets, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries **and for the exclusive purpose of providing benefits**

40

**to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan in violation of ERISA.

182.    As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

183.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

184.    Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their duty of loyalty.

## COUNT III
### Breach of ERISA's Fiduciary Duty of Prudence
### (29 U.S.C. 1104(a)(1)(B))

185.    Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

186.    When exercising discretion and control over Forfeited Plan Assets and using them to reduce Crane contributions, the Plan Fiduciaries failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act *solely* in the interest of the Plan participants and beneficiaries

**and for the exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and** *defraying reasonable expenses* of administering the Plan, in violation of ERISA.

187.    When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce the Crane's own contribution expenses, as opposed paying Plan Administrative Expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to *solely* consider which alternative would promote the **exclusive purpose of providing benefits to Plan participants** and their beneficiaries **and defraying reasonable expenses** of administering the Plan, in violation of ERISA.

188.    By refusing to use Forfeited Plan Assets to eliminate Plan Administrative Expenses that were instead charged to participant accounts, and instead deciding to use these Plan assets to reduce the Crane's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan Administrative Expenses.

189.    Had the Plan Fiduciaries conformed with the minimum standard of care required under ERISA, the Plan Fiduciaries would not have used Forfeited Plan Assets to reduce all of Crane's contribution obligation.

190.    Additionally, by allowing millions of dollars of Forfeited Plan Assets to sit in an unallocated plan account at the end of each year instead of using those amounts to offset Administrative Expenses, Defendants' imprudently caused the value of the Plan's assets to

decrease by causing Plan Participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Administrative Expenses.

191. Alternatively, had the Plan fiduciaries conformed with the minimum standard of care required under ERISA, they would have used Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

192. Plaintiff and the class have suffered losses as a direct result of the Defendants' breach of their duty of prudence.

193. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

194. Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

**COUNT IV**
**Fiduciary Prohibited Transactions/ Self-Dealing**
**(29 U.S.C. 1106(b))**

195. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

196. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a

43

party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

197.    Defendants were and continue to be Plan Fiduciaries. In their management and control of Forfeited Plan Assets, Defendants caused the Plan to use Plan assets (Forfeited Plan Assets) to fund Crane's contractual obligation to make employer matching contributions to the Plan. By allocating these Plan assets toward offsetting Crane's contribution obligations, Defendants saved Crane millions of dollars in employer matching contribution expenses. Defendants therefore dealt with the assets of the Plan in their own interest or for Crane's own account, in violation of 29 U.S.C. § 1106(b)(1).

198.    Additionally, Defendants in their individual capacity or as an agent of Defendant Crane acted in a transaction involving the Plan on behalf of a party (Defendant Crane) whose interests are adverse to the interests of the Plan and the interests of Plan Participants and their beneficiaries in violation of  29 U.S.C. § 1106(b)(2) and received consideration for their own personal accounts from parties dealing with the Plan in connection with transactions involving the assets of the Plan (Forfeited Plan Assets) in violation of 29 U.S.C. § 1106(b)(3).

199.    As a result of this prohibited conduct, Defendants caused the Plan and Plan Participants and class to suffer losses in the amount of the Plan assets that were substituted for employer matching contributions and lost earnings on those assets.

200.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

## COUNT V
### Fiduciary Prohibited Transactions/ Party in Interest
### (29 U.S.C. 1106(a))

201. Plaintiff realleges and incorporates herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

202. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect. . . exchange. . . of any property between the plan and a party in interest . . . or use by or for the benefit of a party in interest, of any assets of the plan."

203. Defendants are parties in interest, as that term is defined under 29 U.S.C. § 1002 (14), because they are Plan Fiduciaries and because Crane is the employer of Plan participants.

204. The Plan's third-party administrators and other service providers are also parties in interest. *See Cunningham*, 604 U.S. at 697 ("[ERISA], in turn defines a "party in interest"" to include various plan insiders, including the plan's administrator, sponsor, and its officers, as well as entities providing services to [the] plan.") (internal citations omitted).

205. When Defendants elected to use Forfeited Plan Assets as a substitute for future employer contributions to the Plan, thereby saving Crane millions of dollars in contribution expenses, Defendants caused the Plan to engage in transactions that constituted a direct or indirect exchange of existing Plan assets for future employer contributions and/or use of Plan assets by or for the benefit of a party in interest.

206. As a result of these prohibited transactions, Defendants caused the Plan to suffer losses in the amount of the Forfeited Plan Assets that were substituted for employer matching contributions and lost investment returns on those assets.

207.    Additionally, when Defendants elected to use Forfeited Plan Assets as a substitute for declared Employer Matching Contributions to the Plan and not for Administrative Expenses, Defendants caused the Plan to engage in prohibited transactions with the Plan's third-party administrator and other service providers for the payment of Administrative Expenses from Plaintiff and all Plan Participants' individual accounts that were sent to the Plan's third-party administrators and other third party service providers and that should have been paid in part or full by the Forfeited Plan Assets.

## COUNT VI
### Breach Of ERISA's Anti-Inurement Provision
### (29 U.S.C. 1103(c)(1))

208.    Plaintiff realleges and incorporates herein by reference each preceding paragraph of this Complaint as though fully set forth herein.

209.    Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

210.    The balance in a participant's accounts that a participant forfeits when incurring a break in service prior to full vesting of the Company's contributions to the participant's account is an asset of the Plan.

211.    By electing to utilize all of these Plan assets as a substitute for the Company's own future contributions to the Plan, thereby saving the Company millions of dollars in contribution expenses, Defendants caused the assets of the plan to inure to the benefit of the employer and failed to defray reasonable expenses of the plan in violation of 29 U.S.C. 1103(c)(1).

212.    Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from violation of ERISA's anti-inurement provision as alleged in this claim and to restore to the Plan all profits secured through their use of Plan assets. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

213.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## **PRAYER FOR RELIEF**

For these reasons, Plaintiff, on behalf of the Plan and all similarly situated participants and beneficiaries, respectfully requests that the Court:

- find and declare that Defendants failed to follow the terms of the Plan, breached their fiduciary duties, and engaged in prohibited conduct and transactions as described above;
- find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each violation of ERISA described above, and to otherwise restore the Plan to the position it would have occupied but for these violations;
- order the disgorgement of all assets and profits secured by Defendants as a result of each violation of ERISA described above;
- determine the method by which Plan losses under 29 U.S.C. §1109 should be calculated;
- order Defendants to provide all accounting necessary to determine the amounts Defendants must make good to the Plan under 29 U.S.C. § 1109(a);

- remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- certify the class, appoint Plaintiff as class representative, and appoint the Chirinos Law Firm PLLC and Cowdery, Murphy & Healy, LLC as class counsel;

- award to Plaintiff and the class their attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- order the payment of interest to the extent it is allowed by law; and

- grant other equitable or remedial relief as the Court deems appropriate.

October 17, 2025                               Respectfully submitted,

                                               **Cowdery, Murphy & Healy, LLC**

                                               /s/*James J. Healy*
                                               James J. Healy (ct28447)
                                               280 Trumbull Street, 22nd Floor
                                               Hartford, Connecticut 06103
                                               (860) 278-5555
                                               (860) 249-0012
                                               jhealy@cmandh.com

                                               **CHIRINOS LAW FIRM PLLC**
                                               Tulio D. Chirinos (*pro hac vice*)
                                               370 Camino Gardens Blvd., Ste 106
                                               Boca Raton, FL 33432
                                               Telephone: (561) 299-6334
                                               tchirinos@chirinoslawfirm.com

                                               *Attorneys for Plaintiff and Proposed Class*

48

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

 //s// James J. Healy (ct28447)
James J. Healy